UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH JAMAUL JOHNSON,<br>        Plaintiff,<br>    v.<br>J. CERMENO, et al.,<br>        Defendants. | Case No. 19-cv-02345-SI (pr)<br><br>**ORDER GRANTING REMAINING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON FAILURE-TO-PROTECT CLAIMS; AND ADDRESSING OTHER PENDING MOTIONS**<br><br>Re: Dkt. Nos. 51, 54 |

This is a *pro se* prisoner's civil rights action under 42 U.S.C. § 1983 in which Joseph Jamaul Johnson alleges that defendants violated his Eighth Amendment rights when they failed to protect him and failed to adequately address his medical needs.[1] The second amended complaint ("SAC") is the operative complaint in this action. Docket No. 17.

On June 8, 2021, the court denied in part defendants' motion for summary judgment on the ground that Johnson failed to exhaust administrative remedies for his failure-to-protect claims against them,[2] and issued a briefing schedule for a further dispositive motion from the remaining defendants. Docket No. 43 at 11-13, 16-17. Defendants have since filed their further motion for summary judgment as to the failure-to-protect claims against them. Docket No. 51. Johnson has filed an opposition to the motion, Docket No. 54, in which he also seeks to amend the SAC, to conduct further discovery, and for leave to hire an expert, *see id.* at 1-2, 9-12. Defendants have filed a reply to the opposition, and they oppose plaintiff's aforementioned motions. Docket No. 56.

---

[1] All other claims were dismissed, including Johnson's excessive-force claim. *See* Docket No. 21 at 5-6.

[2] The court granted in part the motion for summary judgment based on Johnson's failure to exhaust his administrative remedies as to the medical-care claim. *See* Docket No. 43 at 13-16.

For the reasons discussed below, defendants' motion for summary judgment will be granted and judgment entered in defendants' favor and against Johnson, and plaintiff's motions to amend the SAC, to conduct further discovery, and for leave to hire an expert will be denied.

**BACKGROUND**

A. The Parties

Johnson asserts claims based on acts and omissions that occurred at SVSP in July and August 2018. He was a California prisoner incarcerated at Salinas Valley State Prison ("SVSP" or "Salinas Valley") during the relevant time frame, and he now is incarcerated at Kern Valley State Prison.

Defendants were employed at Salinas Valley during the relevant time frame. Oyarzabal, Cermeno and Perez were correctional sergeants; and Matias and Salgado were correctional officers. As further explained below, Johnson alleges that Oyarzabal and Cermeno were aware that Johnson had an enemy on a yard he was being transferred to, but failed to take steps to prevent Johnson's release onto that yard. Docket No. 17, ¶¶ 20-21. Johnson also alleges that when he was attacked on that yard, Matias, Salgado, and Perez allegedly stood by and did nothing. *Id.*, ¶ 6.

B. Factual Background

    1. Johnson's Version

The following is taken from the court's June 8, 2021 Order, which outlined the allegations in Johnson's second amended complaint:

> According to the verified second amended complaint, Johnson was transferred to Salinas Valley in early July 2018, where the following occurred:
>
> On July 12, 2018, a classification committee met with Johnson, found no reason to retain him in administrative segregation, and decided to move him into the general population in Facility C because he had no documented enemy situation at Salinas Valley. Docket No. 17 at 4-5. While Johnson was waiting to be moved to Facility C, correctional sergeants Oyarzabal and Cermeno informed him that he "did have an enemy in Facility C" and therefore could not be released into the Facility C yard. *Id.* at 5. Nonetheless, Johnson was released to Facility C on July 15 and placed on orientation status, which meant he was confined to quarters until a more appropriate housing placement could be made. *Id.*

2

> The next day, July 16, an unidentified correctional officer (C/O) required Johnson to go to the yard. While on the yard, Johnson was "assaulted by four inmates" while C/Os Matias and Salgado and sergeant Perez "stood by and watched." *Id.* A gun tower officer "fired two rounds from the yard tower but hit [Johnson] in the face and arm, rather than his attackers, and caused [him] serious bodily injury." *Id.* brackets added). Johnson was given some treatment at the prison and then was taken to the Natividad Medical Center emergency department where he received sutures. *See id.* at 6.
>
> On July 23, sutures were removed at a clinic and it was recommended that Johnson have "urgent molar fracture repair because [Johnson] had difficulty chewing his food and brushing his teeth, he felt pain on the right face, [and he] had blurry vision." *Id.* brackets added). Although initially hesitant to have surgery, Johnson later changed his mind and submitted numerous health care requests, grievances, and appeals requesting proper medical care on July 26. *Id.* He underwent a "facial bone surgical repair" by Dr. Trapp on August 2 to repair damage from the rounds that were fired from the gun tower and had hit his face. *Id.* Johnson continues to have severe headaches and vision impairment on a daily basis. *Id.* at 7.
>
> After the August 2 surgery, Dr. Sawyer (the medical administrator or chief executive officer of health care services) and registered nurse Villanueva refused to arrange for the physical therapy that was recommended by an outside doctor. *Id.* at 7.
>
> The court earlier determined that the second amended complaint states the following claims for relief under § 1983: (1) an Eighth Amendment claim for deliberate indifference to Johnson's safety against correctional sergeants Oyarzabal and Cermeno, who allegedly knew Johnson had an enemy in Facility C yet failed to prevent Johnson's release into Facility C on or about July 12-15, 2018; (2) an Eighth Amendment claim for deliberate indifference to Johnson's safety against C/O Matias, C/O Salgado, and sergeant Perez, who allegedly stood by and watched as Johnson was being attacked by four inmates on July 16, 2018; and (3) an Eighth Amendment claim for deliberate indifference to Johnson's serious medical needs against Dr. Sawyer and nurse Villanueva, who allegedly failed to arrange for physical therapy that had been recommended by an outside doctor and failed to provide needed medical treatment for Johnson. *See* Docket No. 21 (order of service).

Docket No. 43 at 2-3 (footnotes omitted). As mentioned above, the Court has previously granted in part defendants' motion for summary judgment based on Johnson's failure to exhaust his administrative remedies as to the medical-care claim. *See* Docket No. 43. The only remaining claims are the Eighth Amendment claims for deliberate indifference to Johnson's safety against Oyarzabal, Cermeno, Perez, Matias, and Salgado, stemming from the incident when Johnson was attacked by four inmates on July 16, 2018.

In his opposition, Johnson alleges in a conclusory manner that Oyarzabal "failed to take reasonable measures, like report what he knew was a substantial risk to safety of [Johnson], back when [he] was housed at 'New Folsom' during the periods of [Oyarzabal's] employment [when] he was assigned to 'New Folsom.'" Docket No. 54 at 7. It seems that Johnson's opposition raises a

3

new allegation that Oyarzabal "failed to properly report information he knew was related to two enemies being on the same yard." *See id.* at 11. Specifically, Johnson claims Oyarzabal was aware of Johnson's involvement in an alleged previous attack in California State Prison – Sacramento (also known as "New Folsom") on a "rival prison gang member [named] 'General Jeff'" (who Johnson claims was housed at Salinas Valley during the relevant time frame), but Oyarzabal "continued to withhold from the officials at SVSP, of what he knew, and the result was the attack took place as alleged." *Id.* at 7. Johnson provides no evidence to support his new allegations other than the aforementioned conclusory statements. *See id.* Furthermore, Johnson does not contend that this inmate involved in the incident at the other prison ("General Jeff") was one of the inmates who attacked him on July 16, 2018. *See id.*

### 2. Defendants' Version

Johnson first arrived at Salinas Valley on July 5, 2018. Martines Decl., ¶ 2. Upon arrival, he was temporarily housed in the Administrative Segregation Unit ("AdSeg"). *Id.* On July 12, 2018, he appeared before a classification committee to determine where he should be housed. *Id.* The committee reviewed various factors, including whether Johnson had known enemies at Salinas Valley. *Id.* Decl., ¶¶ 3, 4. This included reviewing Johnson's enemies list. *Id.*

The committee determined that Johnson had an enemy on the B Yard at Salinas Valley, but not on C Yard. *Id.* Decl., ¶ 5, Exh. A. And, because there was no contact between B and C Yards, the committee placed Johnson on C Yard. *Id.*

CDCR records confirm that Johnson had no known enemies on C Yard. Hancock, Exh. attached thereto, submitted under seal for *in camera* review only. Johnson's known enemies were listed in documents known as "separation alerts." *Id.* Reviewing bed assignment records for each inmate identified as Johnson's enemy shows that none of Johnson's known enemies were housed on C Yard at Salinas Valley between July 12, 2018 (the day he was assigned to C Yard), and July 16, 2018 (the day he was attacked). *Id.*

4

Cermeno and Oyarzabal knew that the committee had reviewed these records before deciding to place Johnson on C Yard, and were further aware that the computerized inmate tracking system that CDCR used would have signaled an issue and precluded Johnson from being placed on C Yard if there had been a documented enemy on that yard. Cermeno Decl., ¶¶ 2-4; Oyarzabal Decl., ¶¶ 2-4. Like the classification committee, these records were the only information available to Cermeno and Oyarzabal, or anyone else at CDCR. *Id*.

Cermeno and Oyarzabal deny Johnson's allegations that they informed him that he had a documented enemy on the C Yard in July 2018, and that they further informed him that he could not be released to C Yard as recommended by the classification committee. Cermeno Decl., ¶¶ 2-3; Oyarzabal Decl., ¶¶ 2-3. They claim that they neither said anything about Johnson having a documented enemy on C Yard, nor did they possess any such information establishing that he did, which would have precluded him from being assigned to that yard on July 12, 2018. *See id.* They have since confirmed that, after personally reviewing the housing records of those enemies of Johnson, no documented enemies of Johnson were known to be housed on C Yards at the time Johnson was assigned there. *See id.* Finally, Oyarzabal also denies "false" allegations that he "further questioned the committee's decision in light of a 'documented enemy situation.'" Oyarzabal Decl., ¶ 2.

On July 16, 2018, Johnson was attacked by four other inmates on the recreation area of C Yard. Cermeno Decl., ¶ 11, Exh. A; Perez Decl., ¶ 8, Exh. A; Matias Decl., ¶ 7, Exh. A; Salgado Decl., ¶ 7, Exh. A. Defendant Salgado was present and called in an alarm on institutional radio requesting backup officers. Salgado Decl., ¶ 3. Officer Matias and Sergeant Perez were also present. Perez Decl., ¶ 2; Matias Decl., ¶ 2. All three officers gave verbal commands to the combatants to stop and get down, without compliance. Perez Decl., ¶ 3; Salgado Decl., ¶ 4; Matias Decl., ¶¶ 3, 4. All three officers began to form a skirmish line and await the arrival of additional officers. Perez Decl., ¶ 3; Salgado Decl., ¶ 3; Matias Decl., ¶ 4. Because they were outnumbered, it would not have been safe to advance on the combatants, and so they could not immediately provide

5

assistance to Johnson. Perez Decl., ¶ 7; Salgado Decl., ¶ 6; Matias Decl., ¶ 6. There needed to be enough officers to advance on the inmates and enough additional officers to provide cover on the ones who advanced. *Id*.

While waiting for backup, the officers continued to give verbal commands, but the inmates did not comply. Perez Decl., ¶¶ 3, 4; Salgado Decl., ¶ 4; Matias Decl., ¶¶ 3, 4. Other officers, located in an elevated area of C Yard, fired non-lethal sponge rounds at the combatants to get them to stop fighting, but their efforts were unsuccessful. Perez Decl., ¶¶ 4, 6; Salgado Decl., ¶ 4; Matias Decl., ¶ 3. Officer Matias deployed an O.C. or oleoresin capsicum, i.e. pepper spray) blast grenade toward the altercation which finally persuaded the combatants to comply with the verbal commands to stop and get down. Cermeno Decl., ¶ 6, Exh. A; Perez Decl., ¶ 4, Exh. A; Matias Decl., ¶ 4, Exh. A; Salgado Decl., ¶ 4, Exh. A. Once enough additional officers had responded, Cermeno, Perez, Matias and Salgado were able to take the combatants into custody and escort them to obtain medical treatment. Cermeno Decl., ¶ 7; Perez Decl., ¶ 5; Salgado Decl., ¶ 5; Matias Decl., ¶ 5.

## VENUE AND JURISDICTION

Venue is proper in the Northern District of California because the events or omissions giving rise to the claims occurred at Salinas Valley in Monterey County, which is located within the Northern District. *See* 28 U.S.C. §§ 84, 1391(b). This court has federal question jurisdiction over this action brought under 42 U.S.C. § 1983. *See* 28 U.S.C. § 1331.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

A.   Legal Standard

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and

6

on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (a fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Generally, as is the situation with defendants' challenge to the Eighth Amendment claims, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324.

Where, as is the situation with the qualified immunity defense, the moving party bears the burden of proof at trial, and must come forward with evidence which would entitle him to a directed verdict if the evidence went uncontroverted at trial. *See Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992). He must establish the absence of a genuine issue of fact on each issue material to his affirmative defense. *Id.* at 1537; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248. When the defendant-movant has come forward with this evidence, the burden shifts to the non-movant to set forth specific facts showing the existence of a genuine issue of fact on the defense.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv. Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *See id.* at 631.

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v.*

*McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Here, Johnson's SAC is verified (*see* Docket No. 17 at 10) as well as his opposition (*see* Docket No. 54 at 19), and they are therefore considered as part of the evidence in opposition to defendants' motion for summary judgment.

B.  Eighth Amendment Claims

The Eighth Amendment's prohibition of cruel and unusual punishment requires that prison officials take reasonable measures for the safety of inmates. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). In particular, officials have a duty to protect inmates from violence at the hands of other inmates. *See id.* at 833. A prison official violates the Eighth Amendment only when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the inmate's safety. *See id.* at 834.

To be liable in a failure to prevent harm situation, the official must know of and disregard an excessive risk to inmate safety. *See id.* at 837. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *See id.* He need not "'believe to a moral certainty that one inmate intends to attack another at a given place at a time certain before [he] is obligated to take steps to prevent such an assault.'" *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986) (citation omitted). Before being required to take action he must, however, have more than a "mere suspicion" that an attack will occur. *Id.*; *see, e.g.*, *id.* at 460 (summary judgment appropriate as to defendants when plaintiff "failed to come forward with facts showing that these defendants had any reason to believe he would be attacked by the assailant").

When, as here, the prisoner seeks damages against a defendant, the "inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant

8

whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988). *Leer* explained that "it is important to distinguish the causal connection required when a plaintiff seeks injunctive or declaratory relief as opposed to damages." *Id.* In the former case, a broader and more generalized approach to causation is taken. *See id.*

> When plaintiffs, such as the inmates, seek to hold an individual defendant personally liable for damages, the causation inquiry between the deliberate indifference and the eighth amendment deprivation must be more refined. We must focus on whether the individual defendant was in a position to take steps to avert the [harm], but failed to do so intentionally or with deliberate indifference. In order to resolve this causation issue, we must take a very individualized approach which accounts for the duties, discretion, and means of each defendant. . . . Sweeping conclusory allegations will not suffice to prevent summary judgment. . . . The prisoner must set forth specific facts as to each individual defendant's deliberate indifference.

*Id.* at 633-34 (citations omitted).

Here, to be liable for deliberate indifference to Johnson's safety, defendants must each individually know of and consciously disregard an excessive risk to Johnson's safety. *See Farmer*, 511 U.S. at 837. Johnson has failed to raise a triable issue as to whether defendants acted with deliberate indifference in regard to guaranteeing his personal safety. To survive a summary judgment motion, Johnson must raise a triable issue of fact as to both the objective and subjective prongs of the deliberate indifference standard. Viewing the evidence in the light most favorable to Johnson, there is no triable issue because defendants were not subjectively deliberately indifferent to a risk to Johnson's safety needs.

First, defendants have provided evidence showing Johnson had no known enemies on C Yard at Salinas Valley, and Johnson has failed to present any evidence showing otherwise. Furthermore, defendants could not have prevented the attack on Johnson because they had no indication that the risk of attack was immediate. The record shows that the classification committee reviewed Johnson's known enemies and confirmed that none of them were present on C Yard. Martines Decl., ¶¶ 2-5, Exh. A. The committee did so by reviewing Johnson's separation alerts and the bed assignment records of individuals identified as Johnson's enemies in those alerts. *Id.* It also relied on CDCR's computer system, known as the Strategic Offender Management System, to catch

9

any enemies that the committee might have missed in its review. *Id.*, ¶ 7. Defendants have also provided the separation alerts and bed assignment records to the Court under seal and for *in camera* review as evidence that neither defendants nor the committee had any information available suggesting that Johnson was in any danger from a known, documented enemy. Cermeno Decl., ¶¶ 2-4; Oyarzabal Decl., ¶¶ 2-4; Separation Alerts and Bed Assignment records filed under seal. The court finds no merit to Johnson's allegations in his opposition that Oyarzabal "failed to properly report information he knew was related to two enemies being on the same yard." Docket No. 54 at 11. Read in the light most favorable to Johnson, his new allegations appear to contend that Oyarzabal had some knowledge of an attack at another prison involving Johnson and "General Jeff" based upon Oyarzabal's previous employment at that prison. The court notes that such an allegation is irrelevant because Johnson does not contend that "General Jeff" was one of the inmates who attacked him on June 16, 2018. Furthermore, the claim, unsupported by any evidence, is that Oyarzabal was aware of this incident, for no other reason than that he was working at the same prison when it occurred. But there is no evidence submitted that establishes these allegations as fact. There is no evidence that Oyarzabal worked at the other prison, was on duty when the stabbing occurred, was involved in any investigation, or that his assigned job duties placed him anywhere near the incident such that he would have knowledge of it, much less that he would be aware of the alleged connection to Johnson. In the absence of admissible evidence, the argument is nothing but conjecture based upon speculation, and is insufficient to defeat summary judgment.

Second, taking all of Johnson's allegations as true and construing them in the light most favorable to him, defendants' failure to intervene quickly enough to guarantee Johnson's safety amount at most to negligence. Negligence and even gross negligence are not enough to amount to an Eighth Amendment violation. *Farmer*, 511 U.S. at 835. Deliberate indifference is not shown by merely stating that a defendant should have known of a risk, but requires an actual perception of a risk that does not exist merely because a reasonable person should have perceived a risk. *Id.* at 836 & n.4. Again, Johnson claims that defendants were deliberately indifferent to Johnsons' safety

10

when responding to the attack by other inmates on July 16, 2018. However, the record shows that defendants took reasonable steps to gain control of the situation and abate the attack on Johnson. Salgado was present and called in an alarm on institutional radio for backup officers. Salgado Decl., ¶ 3. Matias and Perez were also present. Perez Decl., ¶ 2; Matias Decl., ¶ 2. All three officers gave verbal commands to the combatants to stop and get down, but the combatants did not comply. Perez Decl., ¶¶ 3 and 4; Salgado Decl., ¶ 4; Matias, ¶¶ 3 and 4. All three officers began to form a skirmish line and await the arrival of additional officers. Perez Decl., ¶ 3; Salgado Decl., ¶ 3; Matias Decl., ¶ 4.) The defendants provide declarations stating that because the officers were outnumbered, it would not have been safe to advance on the combatants, and so the officers could not immediately provide assistance to Johnson. Perez Decl., ¶ 7; Salgado Decl., ¶ 6; Matias Decl., ¶ 6. They explained that there needed to be enough officers to advance on the inmates and enough additional officers to provide cover on the ones who advanced. *Id.* While waiting for backup, the officers continued to give verbal commands, but the inmates still did not comply. Perez Decl., ¶¶ 3 and 4; Salgado Decl., ¶ 4; Matias Decl., ¶¶ 3 and 4. Other officers, located in an elevated area of C Yard, fired sponge rounds at the combatants in an effort to get them to stop fighting, but these efforts were unsuccessful. Perez Decl., ¶¶ 4 and 6; Salgado Decl., ¶ 4; Matias Decl., ¶ 3. Matias deployed an O.C. blast grenade toward the altercation, which finally obtained compliance. Cermeno Decl., ¶ 6, Exh. A; Perez, ¶ 4, Exh. A; Matias Decl., ¶ 4, Exh. A; Salgado Decl., ¶ 4, Exh. A. Once a sufficient number of additional officers had responded, Cermeno, Perez, Matias and Salgado took the combatants into custody and escorted them to obtain medical treatment. Cermeno Decl., ¶ 7; Perez Decl., ¶ 5; Salgado Decl., ¶ 5; Matias Decl., ¶ 5. Perez, Matias and Salgado did not, as alleged by Johnson, stand by and do nothing. Instead, the record shows they were actively engaged in ending the altercation, gave verbal commands that went unheeded, and coordinated with other officers attempting to gain compliance with sponge rounds. As mentioned, Matias even deployed an O.C. blast grenade. Finally, once there were enough officers on the scene, they advanced and took the combatants into custody. Thus, defendants have provided evidence showing that Perez, Matias, and

11

Salgado acted as quickly as circumstances permitted.

In sum, there was an absence of evidence from which a reasonable jury could conclude that defendants had knowledge of, much less a reasonable opportunity to prevent, an immediate risk to Johnson's physical safety. When the evidence is viewed in the light most favorable to Johnson, and inferences therefrom are drawn in his favor, a reasonable jury could not find that defendants were deliberately indifferent to a known risk to Johnson's safety. Defendants therefore are entitled to judgment as a matter of law on the Eighth Amendment claim.

C.   Qualified Immunity Defense

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine of qualified immunity attempts to balance two important and sometimes competing interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

To determine whether a government official is entitled to qualified immunity, courts must consider (1) whether the official's conduct violated a constitutional right, and (2) whether that right was "clearly established" at the time of the alleged misconduct. *Id.* at 232. The inquiry of whether a constitutional right was clearly established must be undertaken in light of the "specific context" of the case, not as a broad general proposition. *Saucier v. Katz*, 533 U.S. 194, 202 (2001); *see also Pearson*, 555 U.S. at 236 (overruling *Saucier*'s requirement that qualified immunity analysis proceeds in a particular sequence). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. "An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that

12

any reasonable official in [his] shoes would have understood that he was violating it, meaning that existing precedent . . . placed the statutory or constitutional question beyond debate." *City and Cnty. of S.F. v. Sheehan*, 575 U.S. 600, 611 (2015) (alteration and omission in original) (citation omitted). This is an "exacting standard" which "gives government officials breathing room to make reasonable but mistaken judgments by protect[ing] all but the plainly incompetent or those who knowingly violate the law." *Id.* (alteration in original) (internal quotation marks omitted).

The Ninth Circuit clarified the qualified immunity analysis for a deliberate indifference claim in *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043 (9th Cir. 2002). The court explained that, for an Eighth Amendment violation based on a condition of confinement (such as a safety risk), the official must subjectively have a sufficiently culpable state of mind, i.e.,

> "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

*Id.* at 1050 (quoting *Farmer*, 511 U.S. at 837). "Thus, a reasonable prison official understanding that he cannot recklessly disregard a substantial risk of serious harm, could know all of the facts yet mistakenly, but reasonably, perceive that the exposure in any given situation was not that high. In these circumstances, he would be entitled to qualified immunity." *Id.* (citing *Saucier*, 533 U.S. at 205). In *Estate of Ford*, the court explained that even though the general rule of deliberate indifference had been expressed in *Farmer*, no authorities had "fleshed out 'at what point a risk of inmate assault becomes sufficiently substantial for Eighth Amendment purposes.'" *See id.* at 1051 (quoting *Farmer*, 511 U.S. at 834 n.3). Because it had not been fleshed out, "it would not be clear to a reasonable prison official when the risk of harm from double-celling psychiatric inmates with one another changes from being *a* risk of *some* harm to a *substantial* risk of *serious* harm. *Farmer* left that an open issue. This necessarily informs 'the dispositive question' of whether it would be clear to reasonable correctional officers that their conduct was unlawful in the circumstances that [they] confronted." *Id.* (emphasis in original).

13

Applying *Estate of Ford* here proves fatal to Johnson's case because it would not have been clear to a reasonable prison officer in their position that they did anything wrong by failing to advise Johnson of enemies on the C Yard, or enemies of which CDCR had no record. Because the law did not put defendants on notice that their conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate. *See Saucier*, 533 U.S. at 202.

The evidence also contradicts Johnson's claim that Matias, Salgado and Perez "stood by and did nothing" during the June 16, 2018 attack. The record shows that these defendants followed standard protocol in calling for, and awaiting the arrival of, backup officers. They simultaneously assessed the effectiveness of verbal commands on the prison's P.A. system, and fired non-lethal rounds while issuing their own verbal commands and deploying a pepper spray grenade. Johnson has not established that such actions amounted to a constitutional violation. In the absence of a constitutional violation, these defendants are also entitled to qualified immunity. Moreover, no legal authority would have provided these defendants with fair notice that the affirmative actions they took, under the circumstances, might violate the constitution. *See id.*.

Defendants have met their burden of proof in their moving papers, and Johnson has not introduced evidence to show the existence of a genuine issue of fact on the defense. Defendants are entitled to judgment as a matter of law on the qualified immunity defense.

**JOHNSON'S MOTION FOR LEAVE TO AMEND AND OTHER RELATED REQUESTS**

As noted, in Johnson's opposition to defendants' motion for summary judgment, he moves to amend the SAC, in which he seeks to "add the shooter(s) [of the fired rounds during the July 16, 2018 incident] as defendants, if this Court finds this new information was provided in good faith and is relevant information as it may relate, to previously dismissed excessive force claim . . . (also the shooters may have information relevant to the claim found cognizable, i.e., the Eight[h] Amendment claim that [Matias, Salgato, and Perez] stood by and watched as [he] was attacked on July 16, 2018 before the shots were fired." Docket No. 54 at 2. Johnson also seems to be seeking

14

further discovery on this issue as he claims that

> [d]iscovery is not complete, because Defendants partially complied with subpoena (RE: DKT. Nos 31, 33) [he] sent to defendants pursuant to Federal Rule of Civil Procedure 45, to seek documents. The result was that incident number SVSP-18-07-0668 was provided to [him] in which names were revealed—that were previously withheld from [him]—allowing for [him] to forward prison grievance to prison officials . . . . The correctional Officers who stated that they fired rounds during the incident on July 16, 2018 are QUIROZ, G. and XIONG, J., [Johnson] submitted grievance by way of prison legal mail to Appeals Coordinator at SVSP, on August 29, 2021.

*Id.* at 1. He requests "further discovery to obtain the use of force protocols" and an "expert, to verify whether or not [a] 40mm launcher when fired at 60 feet, and aimed at the thigh of one person at their lower body, bend upward to hit the face of another." *Id.* at 12.

To the extent that Johnson seeks to amend the SAC to join Quiroz and Xiong, the SVSP employees who allegedly fired rounds, as party-defendants, such a request is DENIED, as further explained below. (Johnson seems to claim that these individuals are the Doe Defendant(s) he mentioned in his SAC who fired one or two rounds that hit him rather than his attackers. *See* Docket No. 54 at 2.)

To give further background on Johnson's excessive force claim, the court notes that this claim was dismissed in its May 19, 2020 Order of Service because the court found that Johnson failed to alleged sufficient facts to support an excessive force claim, stating as follows:

> Johnson does not allege facts plausibly suggesting that the correctional officer fired the round for the purpose of harming him rather than in a good faith effort to stop the ongoing attack and restore discipline. If Johnson has additional facts to allege that support an excessive-force claim, he may file an amendment to his second amended complaint to allege that claim. If Johnson wants to pursue a claim against the shooter for excessive force, he must file an amendment to his second amended complaint and provide that person's true name within sixty days of the date of this order.

Docket No. 21 at 6. The sixty-day time frame to pursue a claim against the shooter for excessive force expired on July 19, 2020, and Johnson failed to file an amendment to his SAC raising this claim with the shooter's true name. Instead, Johnson files a delayed motion to amend his SAC "to add the shooter(s) as defendants." *See* Docket No. 54 at 2.

In their reply, defendants oppose Johnson's motion to amend the SAC to add the shooters stating that, "the claims against these individuals were dismissed in the court's screening order not

15

because [Johnson] could not identify them, but because [he] had failed to state a claim against them." Docket No. 56 at 2 (citing Docket No. 21 at 6). Defendants argue that the shooters are "not part of this suit, the motion [for summary judgment] was not directed at claims against them, and [Johnson's] assertions regarding them are irrelevant to the determination of this motion." *Id.*

Federal Rule of Civil Procedure 15(a)(2) provides that leave to amend a complaint should be "freely given when justice so requires." Fed. R. Civ. P. 15(a)(2). "Four factors are commonly used to determine the propriety of a motion for leave to amend. These are: bad faith, undue delay, prejudice to the opposing party, and futility of amendment." *Ditto v. McCurdy*, 510 F.3d 1070, 1079 (9th Cir. 2007) (citations and internal quotation marks omitted). The decision to grant or deny a request for leave to amend rests in the discretion of the trial court. *See California v. Neville Chem. Co.*, 358 F.3d 661, 673 (9th Cir. 2004).

Here, the pertinent facts persuade the court that granting leave to amend to join new parties is unwarranted. As an initial matter, Johnson unduly delayed in bringing his motion. On May 19, 2020, the court reviewed the SAC and explained to Johnson the reasons the putative excessive force claim against the shooter was infirm. Docket No. 21 at 6. As mentioned, the court gave Johnson sixty days, or until July 19, 2020 to file an amendment to his SAC raising his excessive-force claim with the shooter's true name. He did not do so. Instead, more than a year later, in his September 27, 2021 opposition, he seeks to add the shooters, whose names he has since acquired, as named defendants. This delay suggests bad faith, given that Johnson filed his request after the deadlines set by the court had passed for filing his amendment to his SAC raising his excessive-force claim with the shooter's true name and for defendants' dispositive motion and his opposition. *Acri v. Int'l Ass'n of Machinists & Aerospace Workers*, 781 F.2d 1393, 1398 (9th Cir. 1986) (affirming denial of leave to amend where plaintiff delayed in bringing a proposed claim as a tactical matter to avoid the possibility of an adverse summary judgment ruling).

The proposed amendment also is futile. In neither the SAC nor motion for leave to amend does Johnson state sufficient facts to support an excessive-force claim. *See* Docket Nos. 17, 54.

16

"[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992). "The infliction of pain in the course of a prison security measure, therefore, does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

First, the Court points out that in Johnson's original verified complaint, he alleged that the four attacking inmates caused "facial bone fractures of right jaw; cheekbone; t[e]mple to jaw; broken nose; [and] broken elbow," and thereafter he was shot in the face by someone in the C Yard gun tower that caused him to suffer a cranium fracture and deep laceration on his head. Docket No. 1 at 3. Thus, the record shows that even *before* the shooter fired the round, Johnson had already suffered multiple fractures to bones in his head. *See id.* And just as he did in his SAC, Johnson once again makes *conclusory* allegations in his motion to amend, stating as follows:

> Considering that Plaintiff has alleged that the shooter shot [him] in the face, and that this shot in the face was in the attempt to aid and abet the attackers on July 16, 2018, plaintiff submits that this Officer admits that he "was unaware where the direct impact sponge made contact."

Docket No. 54 at 10. Again, in a conclusory fashion, Johnson "submits that it was this shot that caused the eye socket damage, the cut and injuries to the head of plaintiff, on that day, July 16, 2018." *Id.* As the court has previously found, Johnson still does not allege facts plausibly suggesting that the shooter fired the round for the *purpose* of harming him rather than in a good faith effort to stop the ongoing attack and restore discipline. The record shows that during the attack of the four inmates against Johnson, the officers present gave multiple verbal commands to the combatants to stop and get down, without compliance. Perez Decl., ¶¶ 3, 4; Salgado Decl., ¶ 4; Matias Decl., ¶¶ 3, 4.

It was only after these verbal commands were unsuccessful that the shooter fired non-lethal

17

sponge rounds at the combatants to get them to stop fighting, but the shooter's efforts were equally unsuccessful. Perez Decl., ¶¶ 4, 6; Salgado Decl., ¶ 4; Matias Decl., ¶ 3. (And, it took the deployment of an O.C. blast grenade toward the altercation to ultimately persuade the combatants to comply with the verbal commands to stop and get down. Cermeno Decl., ¶ 6, Exh. A; Perez Decl., ¶ 4, Exh. A; Matias Decl., ¶ 4, Exh. A; Salgado Decl., ¶ 4, Exh. A.) Accordingly, the record shows that these officers used the aforementioned force to ensure compliance by those involved in the attack on Johnson. Considering the severity of the violent attack on Johnson, the multiple injuries he suffered as a result of the attack even prior to the shooter firing the rounds, coupled with the combatants' refusal to cooperate, the Court finds that the force applied by the shooter was a good faith effort to return Johnson back to the jail and not a malicious or sadistic effort to cause harm.[3] Indeed, Johnson merely alleges that the shooter, who had shot him in the face, was "*unaware* where the direct impact sponge made contact." Docket No. 54 at 10. As such, even if Johnson was in fact injured by being shot in the face, the shooter's actions amount at most to negligence, which as mentioned above is not actionable under section 1983 in the prison context. *See Farmer*, 511 U.S. at 835. Therefore, Johnsons fails to state a cognizable excessive-force claim against the shooter.

Finally, the court finds that permitting the proposed amendment would by unduly prejudicial to defendants. Defendants timely filed their motion for summary judgment based on the claims which the Court found cognizable in its Order of Service. To allow Johnson to pursue his delayed and likely unexhausted[4] excessive-force claim at this late stage of the action would undoubtedly be prejudicial, particularly given that the dispositive motion as to the pending cognizable claims has been submitted and resolved in this Order. *Cf. Acri*, 781 F.2d at 1398 (affirming denial of motion

---

[3] In determining whether the use of force was wanton and unnecessary, it is proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials and any efforts made to temper the severity of a forceful response. *See Hudson*, 503 U.S. at 7; *see also LeMaire v. Maass*, 12 F.3d at 1454; *Spain v. Procunier*, 600 F.2d 189, 195 (9th Cir. 1979).

[4] Johnson claims that he submitted a grievance, purportedly relating to his excessive-force claim, on August 29, 2021, but he does not allege whether he received a response and was able to exhaust his administrative remedies as to this claim. *See* Docket No. 54 at 2.

for leave to amend on the ground that "allowing amendment would prejudice the [defendant] because of the necessity for further discovery").

The factors germane to the court's exercise of discretion under Rule 15 militate against granting leave to amend to add the shooters as named defendants. Accordingly, Johnson's motion for leave to amend is DENIED. In light of this decision, to the extent that Johnson seeks to conduct further discovery and for leave to hire an expert relating to the excessive-force claim, such requests are DENIED as moot.

## CONCLUSION

For the foregoing reasons, defendants are entitled to judgment as a matter of law on the merits of Johnson's Eighth Amendment claim as well as on defendants' qualified immunity defense. Defendants' motion for summary judgment is GRANTED and judgment will be entered in their favor. Docket No. 51. As the court has previously granted summary judgment in favor of Dr. Sawyer and nurse Villanueva on Johnson's claim that they were deliberately indifferent to his medical needs in violation of his rights under the Eighth Amendment, *see* Docket No. 43 at 13-16, judgment will also be entered in favor of defendants Sawyer and Villanueva and against Johnson.

Johnson's motion for leave to amend and to conduct further discovery relating to the excessive-force claim is DENIED. Docket No. 54 at 1-2.

The clerk shall close the file.

**IT IS SO ORDERED**.

Dated: July 4, 2022

_____
SUSAN ILLSTON
United States District Judge

19